1

2

3

4                      UNITED STATES DISTRICT COURT

5                            DISTRICT OF NEVADA

6

In re WINDSPIRE ENERGY, INC.,                    )
7                                                )
                  Debtor.                         )
8                                                )
_____              )
                                                 )
9   OFFICIAL COMMITTEE OF UNSECURED               )
CREDITORS,                                        )        3:13-cv-00010-RCJ-WGC
10                                               )
                  Plaintiff,                      )        AMENDED
11                                               )        **ORDER**
        vs.                                       )
12                                               )
GIACOMO MARINI et al.,                            )
13                                               )
                  Defendants.                     )
14  _____          )

15          This adversary proceeding arises out of alleged fraudulent transfers and breaches of

16  fiduciary duties by directors, officers, and shareholders of Debtor Windspire Energy, Inc.,

17  ("Windspire").  Two Defendants have separately moved to dismiss for failure to state a claim.

18  Plaintiff has also filed a motion for partial offensive summary judgment against several

19  Defendants.  Also pending before the Court are a motion to join the Trustee as a party and a

20  motion for leave to amend an answer to plead a counterclaim against the Trustee.  For the

21  reasons given herein, the Court denies all pending motions.

22  I.      FACTS AND PROCEDURAL HISTORY

23          Windspire was formed as Mariah Power, Inc., a Nevada corporation, in 2005, to develop

24  and market a wind turbine known as the "Windspire." (Compl. ¶ 26, Jan. 10, 2013).  Mariah

25  Power, Inc. merged into a Delaware corporation of the same name in 2008 and adopted its

current name in March 2010. (*Id.* ¶ 27).

### A.      The Mastech Agreement

On November 10, 2008, CEO and Director Mike Hess signed an agreement (the "Mastech Agreement") with a Michigan company formed to manufacture the Windspire, Mastech Windspire, LLC ("Mastech"), under which Debtor agreed to pay Mastech 115% of the costs of production. (*Id.* ¶ 30).  Because the Mastech Agreement guaranteed Mastech a profit no matter its efficiency, the poorly negotiated contract resulted in the depletion of Debtor's cash on hand from over $4.2 million in December 2008 to $0 by October 2009, at which point operating expenses were 160% of sales revenue and the Board of Directors knew that at least $2 million to $5 million in additional capital would be required to continue operations. (*Id.* ¶¶ 30–34).  As a result of the alleged breach of fiduciary duty in entering into the Mastech Agreement, Debtor accumulated $1.5 million in mostly unsecured debt, the company was not able to attract further investment, manufacturing ceased from December 2009 until at least March 2010, and Debtor was required to enter into a settlement agreement with Mastech in March 2010 resulting in a $1.3 million benefit to Mastech in cash and other agreements in exchange for Mastech to continue manufacturing operations. (*See id.* ¶ 35).  The board finally recognized in August 2010 that the Windspire was not profitable, and Debtor continued to lose money through at least October 2011. (*Id.* ¶ 36).

### B.      The 2009 Loan

The Board of Directors knew by June 2009 that at least $2 million to $5 million in additional capital would be required to continue operations. (*Id.* ¶ 39).  However, the Board refused to consider financing above $3 million, because the directors wished to maintain their equity stake and indirect control of Debtor. (*Id.* ¶ 40).  The Director Defendants and the Shareholder Defendants (which Director Defendants controlled) held approximately 60% of Debtor's stock. (*See id.*).  In September 2009, Noventi Ventures II, LP proposed a $2 million

1 "bridge loan" (the "2009 Loan") to be funded by the Shareholder Defendants and secured by

2 Debtor's assets. (*Id.* ¶ 42).  The Board approved the loan despite the availability of financing

3 with better terms, and the shareholders approved the loan (which required shareholder approval

4 because it amended the corporate charter) only because of false and misleading information given

5 by members of the Board to the shareholders. (*See id.* ¶¶ 43–50).  The 2009 Loan saddled Debtor

6 with approximately $1 million in debt at a time when it was insolvent, with over 75% of the debt

7 held by controlling insiders, i.e., the Shareholder Defendants. (*Id.* ¶ 51).  Debtor never became

8 profitable, and there is currently approximately $4.5 million in unsecured claims. (*Id.*).  The

9 Committee alleges that the Shareholder Defendants breached their fiduciary duty to Debtor with

10 the intent of obtaining Debtor's assets for their own benefit. (*Id.* ¶ 52).

11      **C.**     **Expansion of Shareholder Defendants' Control**

12      In late March 2010, Noventi Ventures II, LP proposed dilutive Series C equity funding to

13 the insolvent Debtor, to be offered only to existing shareholders. (*Id.* ¶ 54).  The terms of the

14 offer indicated that either Debtor or a majority of the secured debt holders, could convert the

15 2009 Loan to equity if Debtor could not repay the loan by June 2010. (*Id.* ¶ 55).  With this

16 presented to them by the Board as "the only option," the shareholders approved the plan. (*Id.*

17 ¶¶ 55–56).  Thereafter, Noventi Ventures II, LP demanded a change to the terms, so that Debtor

18 would not have the right to convert the 2009 Loan to equity, and the Directors, four out of five of

19 whom held interests in the 2009 Loan, agreed to the amendment without presenting it to the

20 shareholders, breaching their fiduciary duty to Debtor. (*Id.* ¶ 56).  Following this agreement,

21 Shareholder Defendants held 64–74% of Debtor's stock, with Noventi Ventures II, LP itself

22 holding 42–52%. (*Id.* ¶ 58).  By the end of 2010, Debtor remained insolvent and owed over $3.3

23 million in secured debt, with about 91% owed to Shareholder Defendants, and about 69% owed

24 to Noventi Ventures II, LP. (*Id.* ¶ 60).  Director Defendants and Shareholder Defendants had

25 ensured that Shareholder Defendants would be the only entities to receive an appreciable amount

1  in liquidation. (*Id.*).  Communications between the Director Defendants in fact show that they

2  compared the secured debt to "preferred stock" and that the only difference in calling it "debt"

3  was that the Shareholder Defendants would take before creditors in liquidation. (*Id.*).

4         **D.**     **Noventi's Control**

5       In July 2010, non-party CEO Walt Borland hired Robert Mosebar as a "Manufacturing

6  Consultant" and "Director of Manufacturing" for $120,000 per year. (*Id.* ¶ 61).  The Committee

7  alleges that the position was unnecessary, that Mosebar provided no valuable services to Debtor,

8  and that he was simply hired as a "mole" for Noventi Ventures II, LP to assist it in understanding

9  and controlling the manufacturing process and to aid its breaches of fiduciary duty. (*Id.*).  In

10  violation of a 2008 voting agreement providing that the common shareholders would elect the

11  CEO, the Board in October 2010 appointed Noventi Ventures II, LP principal James Horn as

12  CEO. (*Id.* ¶ 62).  The Board passed a resolution whereby Noventi Ventures II, LP or Noventi,

13  LLC would pay Horn directly, and then Debtor would reimburse the Noventi entity at $15,000

14  per month.[1]  The Committee alleges that the appointment of Horn was a breach of fiduciary duty

15  because he was unqualified, and because of the conflict Horn had with Noventi. (*See id.* ¶ 63).

16  Also, Borland had presented the first viable plan to make Debtor profitable by terminating

17  Mastech and retaining a high-quality Nevada manufacturer, *inter alia*. (*Id.* ¶ 64).  The Board

18  therefore violated its duties of loyalty and care by failing to take advantage of a solution to the

19  manufacturing problem. (*See id.* ¶¶ 65–66).

20         **E.**     **The 2011 Financing**

21       In April 2011, the Shareholder Defendants, knowing that Noventi Ventures II, LP would

22  be the primary lender for new loans, proposed amendment to the 2009 Loan to state that all notes

23  issued after April 1, 2011 would be senior to all prior notes, and the Board and CEO Horn

24  _____

25       [1]That agreement is the basis for Noventi, LLC's unsecured claim in the bankruptcy case. (*Id.*).

1   accepted the proposal. (*Id.* ¶ 70).  The Board also approved Secured Promissory Note No. 41,

2   which purported to convert over $1.2 million in unsecured debt to Noventi Ventures II, LP to

3   senior secured debt, for no consideration. (*Id.* ¶ 71).  These acts, at a time when Debtor was

4   insolvent, were breaches of Defendants fiduciary duties, because they made Noventi Ventures II,

5   LP the sole creditor to recover in any liquidation. (*Id.* ¶ 72).  No new investors were sought as an

6   alternative. (*Id.* ¶ 73).  During this time, Noventi Ventures II, LP effectively controlled Debtor,

7   treating it as a subsidiary. (*Id.* ¶¶ 74–75).  For example, Noventi Ventures II, LP rejected a

8   proposed merger by a Japanese company, Zephyr, after it engaged in direct negotiations with

9   Zephyr, and without informing the Board of the proposal. (*Id.* ¶ 75).

10  **F.      The Attempted "Asset Grab"**

11       Noventi Ventures II, LP usurped Debtor's corporate opportunities by placing an intern at

12  Windspire, Marco DiFulvio, to copy confidential information and transport it back with him to

13  Italy, where DiFulvi's associated company, Innova, was to engage in other wind-power-related

14  joint ventures with Noventi Ventures II, LP and other Italian companies. (*Id.* ¶¶ 76–78).  Noventi

15  Ventures, LP contemplated three different transactions in furtherance of the plan to obtain

16  Debtor's assets and leave creditors with nothing.  Under option 1, Noventi Ventures, LP would

17  sell its senior secured debt to Linear Capital Partners, who would then foreclose on Debtor's

18  assets and put them into a new public shell company, in which Noventi Ventures, LP would

19  receive a 20% interest, and Horn would be made the CEO. (*Id.* ¶ 79).  Under option 2, Debtor

20  would file for bankruptcy, in which its assets would be sold free and clear in a § 363 sale,

21  Noventi Ventures II, LP would receive 19% of the stock of a new public company, unsecured

22  creditors would receive 1%, and Horn would be made CEO. (*Id.*).  Option 2 would reach the

23  same result as Option 1, except that unsecured creditors would receive token amounts, and any

24  potential lingering liabilities would be extinguished. (*Id.*).  The present Chapter 11 case

25  represents option 2. (*Id.*).  Under option 3, Debtors assets would be sold in exchange for an 8%

1  equity interest in an undercapitalized company, with 90% of the consideration going to Noventi

2  Ventures II, LP and 5% going to unsecured creditors. (*Id.*).  The agreement would give Noventi

3  Ventures II, LP broad voting powers and releases from liability. (*Id.*).  All three options would

4  have the same substantive result: a new entity would receive Debtor's assets, Noventi Ventures

5  II, LP would receive a substantial stake in the transferred equity, and Debtor's liabilities would

6  be avoided. (*Id.* ¶ 80).  Horn called Debtor's bankruptcy counsel on January 20, 2012 and asked,

7  "[I]f the asset acquisition . . . won't happen . . . how [can] Noventi . . . acquire the assets of the

8  company?" (*Id.* ¶ 81).  On May 14, 2012, the Bankruptcy Court ordered a Chapter 11 Trustee to

9  be appointed, who later determined it was in the best interests of the estate to move forward with

10  a § 363 sale to the cash bidder, Ark Alloy, LLC, or any higher bidder. (*Id.* ¶ 82).  Ark Alloy

11  bought the assets for $100,000. (*Id.*).

12    **G.    Bankruptcy-Related Misconduct**

13    Although the pre-petition financial repors indicate that Debtor may have been viable

14  minus its improperly acquired debt, Horn sought bankruptcy for the improper purpose of

15  obtaining control of Debtors's assets for Shareholder Defendants, while shedding the liabilities.

16  (*Id.* ¶¶ 83–84).  The Board has breached its duty of loyalty by failing to explore a true

17  restructuring. (*Id.* ¶ 84).  Peter Henig resigned rather than vote on whether to petition for

18  bankruptcy, but Horn, Giacomo Marini, and Ian Rogoff voted to do so despite their personal

19  interests, without obtaining the consent of the shareholders. (*Id.* ¶ 85).  These directors eventually

20  resigned, but not before appointing Robert Mosebar as President and Director of the Debtor in

21  Possession. (*Id.* ¶ 87).  Mosebar was again controlled by Noventi Ventures II, LP, and he was

22  serving as that company's representative on the Committee, as well. (*Id.* ¶ 88).  He refused to

23  resign, despite the conflict of interests. (*Id.*).  Mosebar violated his duties to Debtor by serving

24  Noventi Ventures II, LP's interests while appointed to serve Debtor. (*Id.* ¶ 89).  The Committee

25  accuses Mosebar of making false statements to the Bankruptcy Court in several contexts. (*See*

1    *id.*).

2        **H.      Conversion of Estate Assets and Spoilation of Evidence**

3        When Ark Alloy attempted to collect Debtor's assets, it found that the primary and

4    backup hard drives of Debtor's server had been either wiped clean or replaced with blank drives.

5    (*Id.* ¶ 91).  Mosebar has admitted shutting down Debtor's servers on May 14, 2012, having been

6    at the headquarters again on July 27, 2012, and that only he, the Trustee, and the landlord had

7    access to the property. (*Id.* ¶ 92).  When Mosebar produced for Ark Alloy what he claimed to be

8    a full copy of Debtor's hard drives, Debtor's former chief operating engineer reviewed it and

9    found that a substantial amount of engineering data was missing, without which Ark Alloy would

10   not be able to produce Windspire's product. (*Id.* ¶ 93).  A substantial amount of dealer

11   information was also missing. (*Id.* ¶ 94).

12       **I.      The Present Case**

13       The Committee brought an adversary proceeding in the Bankruptcy Court for: (1)–(2)

14   breach of fiduciary duty; (3) aiding and abetting breach of fiduciary duty; (4) corporate waste;

15   and (5)–(17) various core bankruptcy claims.  The Committee named fourteen Defendants, which

16   the Court will categorize into three groups: (1) Giacomo Marini, Ian Rogoff, Tim Rodgers, Hess,

17   Michael Schwab, Peter Henig, James Horn, and Robert Mosebar (collectively, "Director

18   Defendants"), (*see id.* ¶¶ 8–15)[2]; (2) Noventi Ventures II, LP ("Noventi"), Big Sky Venture

19   Capital III, LLC ("Big Sky III"), Big Sky Venture Capital IV, LLC ("Big Sky IV"), Greenhouse

20   Capital Partners, LP ("Greenhouse"), and Venmilo Partners, LLC ("Venmilo") (collectively,

21

22

23   ────────────────

24       [2]Director Defendants are alleged to have been directors of Debtor at various times. (*See id.*).  Hess and Horn are also alleged to have been CEO of the Debtor at various times, (*see id.*

25   ¶¶ 11, 14), and Mosebar is also alleged to have been a manufacturing consultant, Director of Manufacturing, and President of Debtor at various times, (*see id.* ¶ 15).

1   "Shareholder Defendants") (*see id.* ¶¶ 16–20)[3]; and (3) Noventi, LLC, (*see id.* ¶ 21).[4]

2        The Court granted two motions to withdraw the reference in part and a motion to

3   withdraw the reference in full.  Big Sky III and Big Sky IV have moved to dismiss the second,

4   third, and fifth claims.  Greenhouse has separately moved to dismiss the same claims.  The

5   Committee has moved for offensive summary judgment as to the liability of the Director

6   Defendants and Noventi Ventures II, LP on the breach of fiduciary duty claims.

7   **II.        LEGAL STANDARDS**

8        **A.        Dismissal**

9        Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the

10  claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of

11  what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47

12  (1957).  Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action

13  that fails to state a claim upon which relief can be granted.  A motion to dismiss under Rule

14  12(b)(6) tests the complaint's sufficiency. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720

15  F.2d 578, 581 (9th Cir. 1983).  When considering a motion to dismiss under Rule 12(b)(6) for

16  failure to state a claim, dismissal is appropriate only when the complaint does not give the

17  defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell*

18  *Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In considering whether the complaint is

19  sufficient to state a claim, the court will take all material allegations as true and construe them in

20  the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th

21

22  [3]Shareholder Defendants are alleged to be both shareholders and putative unsecured creditors of Debtor. (*See id.*).  Horn is also alleged to have been a partner or of Noventi and/or a manager of non-party Noventi Partners II, LLC. (*See id.* ¶ 16).  Schwab is alleged to be the

23  managing member of Big Sky III and Big Sky IV. (*See id.* ¶ 18).  Henig is alleged to be the managing partner of Greenhouse. (*See id.* ¶ 19).  Rogoff is alleged to have been the manager of

24  Venmilo. (*See id.* ¶ 20).

25  [4]Noventi, LLC is alleged to be a putative unsecured creditor of Debtor. (*See id.*).

1  Cir. 1986).  The court, however, is not required to accept as true allegations that are merely

2  conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden*

3  *State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  A formulaic recitation of a cause of action

4  with conclusory allegations is not sufficient; a plaintiff must plead facts pertaining to his own

5  case making a violation plausible, not just possible. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79

6  (2009) (citing *Twombly*, 550 U.S. at 556) ("A claim has facial plausibility when the plaintiff

7  pleads factual content that allows the court to draw the reasonable inference that the defendant is

8  liable for the misconduct alleged.").  In other words, under the modern interpretation of Rule

9  8(a), a plaintiff must not only specify a cognizable legal theory (*Conley* review), but also must

10 plead the facts of his own case so that the court can determine whether the plaintiff has any

11 plausible basis for relief under the legal theory he has specified, assuming the facts are as he

12 alleges (*Twombly-Iqbal* review).

13        "Generally, a district court may not consider any material beyond the pleadings in ruling

14 on a Rule 12(b)(6) motion.  However, material which is properly submitted as part of the

15 complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner*

16 *& Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citation omitted).  Similarly, "documents

17 whose contents are alleged in a complaint and whose authenticity no party questions, but which

18 are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6)

19 motion to dismiss" without converting the motion to dismiss into a motion for summary

20 judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).  Moreover, under Federal Rule

21 of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay*

22 *Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986).  Otherwise, if the district court

23 considers materials outside of the pleadings, the motion to dismiss is converted into a motion for

24 summary judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir.

25 2001).

1    **B.    Summary Judgment**

2        A court must grant summary judgment when "the movant shows that there is no genuine

3    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

4    Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson v.*

5    *Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there

6    is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  A

7    principal purpose of summary judgment is "to isolate and dispose of factually unsupported

8    claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In determining summary

9    judgment, a court uses a burden-shifting scheme:

10           When the party moving for summary judgment would bear the burden of proof at
             trial, it must come forward with evidence which would entitle it to a directed verdict
11           if the evidence went uncontroverted at trial.  In such a case, the moving party has the
             initial burden of establishing the absence of a genuine issue of fact on each issue
12           material to its case.

13   *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations

14   and internal quotation marks omitted).  In contrast, when the nonmoving party bears the burden

15   of proving the claim or defense, the moving party can meet its burden in two ways: (1) by

16   presenting evidence to negate an essential element of the nonmoving party's case; or (2) by

17   demonstrating that the nonmoving party failed to make a showing sufficient to establish an

18   element essential to that party's case on which that party will bear the burden of proof at trial. *See*

19   *Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary

20   judgment must be denied and the court need not consider the nonmoving party's evidence. *See*

21   *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

22       If the moving party meets its initial burden, the burden then shifts to the opposing party to

23   establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

24   475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party

25   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

1   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

2   versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

3   626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment

4   by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d

5   1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and

6   allegations of the pleadings and set forth specific facts by producing competent evidence that

7   shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

8         At the summary judgment stage, a court's function is not to weigh the evidence and

9   determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477

10   U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are

11   to be drawn in his favor." *Id*. at 255.  But if the evidence of the nonmoving party is merely

12   colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

13   **III.**     **ANALYSIS**

14         **A.**       **Motions to Dismiss**

15         **1.**       **Breach of Fiduciary Duties**

16         Big Sky II and Big Sky III (collectively, "Big Sky") ask the Court to dismiss the second,

17   third and fifth claims against them for breach of fiduciary duty, aiding and abetting breach of

18   fiduciary duty, and equitable subordination under the Bankruptcy Code.  Big Sky is only

19   mentioned by name in approximately four places in the Complaint: (1) Big Sky III is identified in

20   paragraph 17; (2) Big Sky IV is identified and Big Sky are alleged to be putative secured

21   creditors and shareholders of Debtor, with Schwab as their managing member, in paragraph 18;

22   (3) Big Sky is alleged to have been one of the investors that funded the merger of Mariah Power,

23   Inc. (NV) into Mariah Power, Inc. (DE) in paragraph 28; and (4) Big Sky is alleged in paragraph

24   40 to have controlled, in combination with other Shareholder Defendants, 60% of Debtor's stock

25   at the time of the 2009 Loan.  However, Big Sky is included as two of the "VC Firms" in the

1    Complaint, which this Order refers to as Shareholder Defendants, and Shareholder Defendants'

2    alleged collective bad acts are noted throughout the complaint, as detailed, *supra*.

3          Big Sky argues that it was a minority shareholder that participated with other shareholders

4    in lending money to Debtor in the hope that Debtor would survive and become profitable.  Big

5    Sky argues that the Complaint includes no allegations of wrongdoing by Big Sky.  The Court

6    disagrees.  The Complaint alleges in detail that, as controlling shareholders, Big Sky and other

7    Shareholder Defendants, had a duty not to engage in self-dealing, such as loaning money to the

8    corporation with terms more favorable to itself than to the corporation.  The only potential

9    deficiency in the allegations is that Big Sky is clearly not alleged to have had a controlling

10   interest in Debtor.  Generally, in Delaware—and the parties do not appear to dispute that

11   Delaware law controls here—"a shareholder owes a fiduciary duty only if it owns a majority

12   interest in or exercises control over the business affairs of the corporation." *Ivanhoe Partners v.*

13   *Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987).  A minority shareholder may be a

14   controlling shareholder, and therefore owe the corporation a fiduciary duty, however:

15         [A] shareholder who owns less than 50% of a corporation's outstanding
             stocks does not, without more, become a controlling shareholder of that corporation,
16         with a concomitant fiduciary status.  For a dominating relationship to exist in the
             absence of controlling stock ownership, a plaintiff must allege domination by a
17         minority shareholder through actual control of corporation conduct.

18   *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989) (internal quotation

19   marks and citation omitted).  Alternatively, as the Committee notes, in Delaware, controlling

20   shareholder status of a minority shareholder can be shown via a "control group" theory, whereby

21   more than one minority shareholders act in concert with one another such that the group as a

22   whole can exert de jure or, presumably, de facto control over the corporation sufficient to

23   implicate fiduciary duties:

24         Although a controlling shareholder is often a single entity or actor, Delaware case
             law has recognized that a number of shareholders, each of whom individually cannot
25         exert control over the corporation (either through majority ownership or significant

1
2
3
4
5

voting power coupled with formidable managerial power), can collectively form a control group where those shareholders are connected in some legally significant way—e.g., by contract, common ownership, agreement, or other arrangement-to work together toward a shared goal.  In that case, the control group is accorded controlling shareholder status, and, therefore, its members owe fiduciary duties to their fellow shareholders.  However, a "stockholder is entitled to vote its shares as it chooses, including to further its own financial interest."  Accordingly, if all a complaint alleges is that a group of shareholders have "parallel interests," such allegations are insufficient as a matter of law to support the inference that the shareholders were part of a control group.

6
7

*Dubroff v. Wren Holdings, LLC*, No. 3940-VCN, 2009 WL 1478697, at *3 (Del Ch. May 22,

8

2009) (footnotes omitted).  Although the opinion is unpublished, there are other unpublished

9

opinions holding the same, *see, e.g.*, *Frank v. Elgamal*, No. 6120-VCN, 2012 WL 1096090, at *8

10

(Del. Ch. Mar. 30, 2012) (citing *id.*), none that the Court can find holding to the contrary, and the

11

argumentation therein is persuasive.  The control group theory is based upon the same essential

12

reasoning as the "dominating relationship" theory.  That is, neither a "dominating" minority

13

shareholder under *Citron*, nor a "control group" minority shareholder under *Dubroff* is a de jure

14

controlling shareholder, because neither directly controls over 50% of the corporation's stock.

15

But the Court of Chancery has found it appropriate to impose upon a shareholder the same

16

fiduciary duties as are imposed upon a de jure controlling shareholder if the shareholder can

17

control the corporation in fact.  It is the fact of control that matters.  De jure (50%+) control

18

simply makes the question of control conclusive.  Whether control comes via "domination" or

19

concerted action does not seem critical to the ultimate question of control.  If anything, it is *more*

20

appropriate to view concerted action between shareholders holding a collective majority of shares

21

as de facto control than the acts of a "dominating" minority shareholder or shareholder group,

22

because the concept of "domination" inherently includes an element of subjective judgment,

23

whereas the facts of combined de jure ownership and collusion can both be objectively proved.

24

The remaining question is whether the Committee has sufficiently alleged that the

25

Shareholder Defendants had more than a mere common interest, but rather had an actual

1  agreement to act in concert.  The Court believes this circumstance has been sufficiently alleged.

2  The Committee alleges that the 2009 Loan was given jointly by the Shareholder Defendants,

3  whose principals were other Director Defendants.  The Committee sufficiently alleges collusion

4  between those Director Defendants as to the 2009 Loan, amendments thereto, and the Series C

5  equity funding.  The Court therefore denies the motion to dismiss as against the second and third

6  claims.  Whether Shareholder Defendants had control group status via concerted action or

7  violated their putative fiduciary duties applicable thereto with respect to the 2009 Loan,

8  amendments thereto, and Series C equity funding are questions of fact for a jury.  For the same

9  reasons, the Court denies Greenhouse's separate motion to dismiss.

10         **2.        Equitable Subordination/Disallowance**

11         The Committee brings a claim against Noventi Ventures II, LP, Big Sky, Greenhouse,

12  Venmilo, Rogoff, Mosebar, Hess, and Noventi, LLC for equitable subordination or equitable

13  disallowance of those Defendants' claims against the estate because these Defendants were all

14  insiders whose claims against the estate "arise from the allegedly secured or senior secured debt

15  that resulted from the breaches of duty and inequitable conduct described above" and which

16  would deprive the innocent unsecured creditors of any recovery if allowed.

17         [A]fter notice and a hearing, the court may–

18                 (1) under principles of equitable subordination, subordinate for
                   purposes of distribution all or part of an allowed claim to all or part of
19                 another allowed claim or all or part of an allowed interest to all or part of
                   another allowed interest; or
20
                   (2) order that any lien securing such a subordinated claim be
21                 transferred to the estate.

22  11 U.S.C. § 510(c).  The rule as it relates to insiders is summarized in the American Law

23  Reports:

24                 In order to equitably subordinate the claim of a corporate insider, the courts
                   must find that the insider committed misconduct and used its control over a
25                 financially troubled entity for personal gain and to the detriment of other debtors. If

1   insiders have misused their control, principles of fairness would be violated by
    permitting the insiders to partake in distribution on an equal basis with other
2   creditors.

3   John J. Dvorske, *Bankruptcy: Equitable Subordination, Under 11 U.S.C.A. § 510(c), of Insider*

4   *Claims*, 2 A.L.R. Fed. 2d 119 (2005).  The Court will not dismiss this claim, which has been

5   sufficiently pled to require an examination of the facts at summary judgment or by a jury.

6          **B.        Motion for Summary Judgment**

7          The Committee asks the Court to grant it offensive summary judgment as to the liability

8   of Director Defendants and Noventi Ventures II, LP ("Noventi") for breaches of fiduciary duty or

9   aiding and abetting such breaches, and against Marini, Rogoff, Horn, and Noventi for Corporate

10  Waste.  It is clear that the Director Defendants owed a fiduciary duty. *See Arnold v. Soc'y for*

11  *Sav. Bancorp*, 678 A.2d 533, 539 (Del. 1996) ("Fiduciary duties are owed by the directors and

12  officers to the corporation and its stockholders.").  It is not factually clear whether Noventi owed

13  such a duty, although it is sufficiently alleged to have aided and abetted the Director Defendants'

14  alleged breaches.

15         The Court agrees with Defendants that the questions of breach of fiduciary duty and

16  waste are for a fact-finder in this case.  Defendants catalogue the many factually disputed issues.

17  The Court will not recount in detail the several pages of disputed facts Defendants have

18  presented, which are supported by citations to declarations and transcripts in the record.  There

19  are complex issues of disputed fact precluding summary judgment in this case.  Attempting to

20  sort the issues out on motion practice would require the Court to weigh evidence, which it may

21  not do.  The Court would for the same reason be strongly disinclined to grant defensive summary

22  judgment, as well, although Defendants have not so moved.  Whether certain expenses or

23  business decisions were reasonable or breaches of the duties of loyalty or care are for the jury in

24  this case.

25  ///

1      **C.      Motion for Joinder and Motion to Amend**

2      Noventi asks to join the Chapter 11 Trustee as a Plaintiff in the present case and

3  simultaneously asks the Court for leave to amend its answer to plead a counterclaim against the

4  Trustee, assuming the Court were to grant the motion for joinder.  The Court denies the motions.

5  Movant misapprehends Rule 19.  As movant notes, the Bankruptcy Court has approved a

6  stipulation permitting the Committee to pursue any claims the Trustee would normally pursue in

7  the present case such that the Trustee's presence here is unnecessary.  The Trustee is not alleged

8  to claim any interest in the subject matter of the lawsuit herself, and the party she represents, the

9  Estate, is sufficiently represented here by the Committee. *See* Fed. R. Civ. P. 19(a)(1).  Indeed,

10  the unsecured creditors have claims against the Estate and therefore have an even greater

11  motivation than the Trustee herself to adequately protect the assets of the Estate, and there is no

12  risk of inconsistent rulings or an inability of the Court to afford complete relief. *See id.*

13      The nature of the proposed counterclaim makes the purpose for the requested joinder

14  apparent.  Movant seeks to add a counterclaim against the Trustee for declaratory judgment as to

15  core bankruptcy issues still being litigated in the bankruptcy court.  If movant is unhappy with

16  the actions of the Trustee qua trustee or with the Bankruptcy Court's rulings, it may take up those

17  issues with the bankruptcy judge, and then on appeal under 28 U.S.C. § 158, but it may not

18  obtain from the district court what would in essence be an appellate ruling via a putative civil

19  claim for declaratory judgment in an adversary proceeding.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

1

**CONCLUSION**

2      IT IS HEREBY ORDERED that the Motions to Dismiss (ECF Nos. 40, 52) are DENIED.

3      IT IS FURTHER ORDERED that the Motion for Summary Judgment (ECF No. 105) is

4  DENIED.

5      IT IS FURTHER ORDERED that the Motion for Joinder (ECF No. 170) is DENIED.

6      IT IS FURTHER ORDERED that the Motion to Amend (ECF No. 171) is DENIED.

7      IT IS SO ORDERED.

8  Dated this 21st day of February, 2014.

9

10

_____
ROBERT C. JONES
United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25